**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**MICHAEL J. BIESTEK,**

        Plaintiff,        CIVIL ACTION NO. 13-cv-11887

vs.

                              CHIEF JUDGE GERALD E. ROSEN

**COMMISSIONER OF**        MAGISTRATE JUDGE MONA K. MAJZOUB
**SOCIAL SECURITY,**

        Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Michael Biestek seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security benefits for his physical and mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 16) and Defendant's Motion for Summary Judgment (docket no. 18). Plaintiff filed a Response to Defendant's Motion. (Docket no. 20.) The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 4.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this Report and Recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

**I.    RECOMMENDATION:**

The undersigned recommends that Plaintiff's Motion for Summary Judgment (docket no. 16) be GRANTED IN PART AND DENIED IN PART and that Defendant's Motion for Summary Judgment (docket no. 18) be DENIED. The Court should reverse and remand this matter under sentence four of 42 U.S.C. § 405(g) for a proper Step-2 determination in accordance with this Report

and Recommendation and, if necessary following such a determination, for additional determination with regard to the Vocational Expert's testimony as discussed herein. Plaintiff's Motion with regard to all other issues should be denied.

## II. PROCEDURAL HISTORY:

Plaintiff filed an application for Disability Insurance Benefits and an application for Supplemental Security Income with protective filing dates of March 25, 2010, alleging that he had been disabled since October 28, 2009,[1] due to back pain and depression. (*See* TR 12.) The Social Security Administration denied benefits, and Plaintiff requested a *de novo* hearing, which was held on June 24, 2011, before Administrative Law Judge (ALJ) Gregory Holiday, who subsequently found that Plaintiff was not entitled to benefits because he was capable of performing a significant number of jobs in the national economy. (TR 12-25.) The Appeals Council declined to review the ALJ's decision, and Plaintiff commenced this action for judicial review. The parties then filed their instant Motions.

## III. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT'S TESTIMONY

### A. Plaintiff's Testimony

Plaintiff was 48 years old at the time of the administrative hearing and 46 years old at the time of alleged onset. (*See* docket no. 16 at 5.) Plaintiff testified that he had graduated high school and attended one year of college. (TR 35.) At the time of the hearing, he had not worked since the time of his alleged onset, and he had no source of income. (TR 35.) Plaintiff lived in a house with his mother and two dogs. (TR 36-37.) Plaintiff's added that his ex-wife and 13-year-old son lived about a mile and a half from his mother's home. (TR 44.) Plaintiff told the ALJ that he built

---

[1] Plaintiff had a previous application denied by another ALJ on October 27, 2009.

scaffolding for a living until he was unable to do so because of pain in his lower back. (*See* TR 46.) When he could no longer work, he became depressed, which eventually lead to his divorce in 1990. (TR 46-47, 52.) By 2006, Plaintiff had no place to live, so he moved in with two individuals that he believed were college students. (TR 66.) Ultimately, these two individuals turned out to be "kind of like gypsies." (TR 66-67.) Plaintiff testified that after he learned that the individuals had been using his razor and his toothbrush, he tested positive for Hepatitis C. (TR 67.) Plaintiff told the ALJ that he smoked 10 to 20 cigarettes a day, but he did not drink, he did not smoke marijuana, he did not use cocaine or heroin, and that he had never used any other illegal drugs. (TR 51.) Plaintiff testified that he "[n]ever had a drug problem." (TR 51.)

With regard to his back problems, Plaintiff testified that the pain in his lower back had gotten progressively worse since the time of his last hearing. (TR 59.) He told the ALJ that he could have walked about a half mile at his last hearing, but at the time of his testimony, he was only able to walk about a city block without a cane. (TR 59, 68.) Plaintiff testified that the pain "feels like [he] just constantly got (sic) a sword stuck in [his lower] back, and it just feels like someone twists it occasionally because it hits a nerve." (TR 63.) He testified that the pain started in his lower back, but "the past couple years it's radiated to my upper back." (TR 59.) Plaintiff further testified that he could sit for 15 to 20 minutes and stand for about 10 minutes before he would have to sit back down.[2] (TR 68.) He noted that he had difficulty lifting a gallon of milk without pain and that he had problems bending, twisting, and turning. (TR 68-69.) He also told the ALJ that he had trouble sleeping at night because of his back pain and that his most comfortable position was laying flat on his back with pillows beneath his knees. (TR 57-58, 63-64.) Plaintiff stated that while he can drive

---

[2]Plaintiff stood up to change positions while testifying because his back hurt. (*See* TR 43, 47.)

a car, he rarely does because "a couple of times in the past" when he tied his shoes, he pinched a nerve in his back and blacked out. (TR 41.) Plaintiff testified that he used a cane in the afternoon because his pain would gradually build up during the day. (TR 55.)

To manage his back pain, Plaintiff takes 20 milligrams of Methodone each morning and another 20 milligrams of Methodone every afternoon. He also takes 5 milligrams of Valium each afternoon and each evening. (TR 42.) Plaintiff noted that he switched from Methodone to Morphine for a short time when his insurance lapsed. (TR 42-43.) Additionally, Plaintiff testified that he had several injections, including facet joint blocks and epidural injections. (TR 48-49.) He told the ALJ that the injections were so painful that he jerked and twisted one of his vertebrae. (*Id.*) Plaintiff testified that he visited with a surgeon about his back pain but decided against surgery because "if I did an operation there's only a 50 percent chance that it might help." (TR 61.) And even if it did, a "success" would mean that Plaintiff "wouldn't be able to bend, . . . wouldn't be able to twist, . . . and would have to probably have help going to the bathroom, sitting down, and thinks like that" because the surgery involved fusing five vertebrae together. (TR 61.) Plaintiff testified that his doctor suggested that he "try and tolerate the pain as best [he] can until it's completely unbearable." (TR 61.) And he told Plaintiff that "he wouldn't operate on himself if he was me." (TR 61.)

With regard to his Hepatitis C, Plaintiff testified that it causes him extreme fatigue, which exacerbates some of the mobility problems caused by his back pain. (TR 64.) He told the ALJ that he is short of breath by the time he climbs a set of stairs. (TR 64.) He stated that he started treatment for his Hepatitis C in November 2010 but that the injections were so fatiguing that he was in bed for over a week. (TR 65.) He would also vomit and have diarrhea "a lot." (TR 65.) By the fifth or sixth treatment, Plaintiff said that the treatment caused so much pelvic joint pain that he was crying, so he decided to end his treatment due to the side effects. (TR 65-66.) He also told the ALJ

that he had severe weight fluctuations due to his treatment. (TR 35-36.)

With regard to his depression, Plaintiff noted that following his divorce and the depression resulting from his loss of work, his doctor prescribed Desyrel, which he took for "four to five years," and "quit when [he] was better." (TR 52.) Plaintiff testified, however, that when he started his Hepatitis C treatment, the medication listed "suicidal thoughts and symptoms" as the first side effect. (TR 52-53.) Plaintiff told the ALJ that although he asked his doctor to put him back on Desyrel, his doctor was not comfortable doing so. (TR 53.) Plaintiff testified that after about five treatments, he attempted to kill himself by pulling the trigger on what he believed was a loaded gun put to his head; the individual who gave him the gun had removed the bullets without Plaintiff's knowledge. (TR 54.) Plaintiff went to the hospital for help, and at the time of his hearing, he was taking 150 milligrams of Desyrel daily. (TR 54, 67.) Plaintiff indicated that the mediation had helped with his depression, and he was no longer suicidal. (TR 68.) Plaintiff testified that his only friend is his neighbor, and that at the time of the hearing, he had recently started taking care of his son, and he was getting along with his ex-wife "very well." (TR 44, 47.)

In terms of daily activities, Plaintiff testified that he is home with his mother each day. She cooks his meals for him and does most of the laundry. (TR 37-38.) Plaintiff noted, however, that he does some of the laundry and does some grilling in the summer; he also does his own dishes and makes his own bed. (TR 38, 39.) Plaintiff testified that he does not do much of the yard work, although he does occasionally cut the lawn even though it takes him "almost an hour" because he has to take a break to sit down and "adjust his back." (TR 38-39.) Plaintiff told the ALJ that his son would come over to his mother's house, or Plaintiff would visit his son. (TR 44, 45.) He further testified that his son had started playing football, and he and his ex-wife would go to the high school to watch him play. (TR 55.) Plaintiff stated that when he went to the games, he would have to use

a cane to walk to the stands and that he would have to constantly change positions between sitting, standing, and kneeling, to alleviate his back pain. (TR 55-57.)

### B.     Medical Record

Defendant acknowledges that "[t]he facts in this case were adequately summarized in the ALJ's decision and Plaintiff's brief." (Docket no. 18 at 7.) Therefore, Defendant does not summarize Plaintiff's medical record. The undersigned has reviewed Plaintiff's medical record, agrees with Defendant, and will, therefore, incorporate by reference the medical record as set forth in the ALJ's opinion (TR 16-22) and as set forth in Plaintiff's Motion (Docket no. 16 at 6-9). The Court will incorporate additional comments and citations as necessary throughout this Report and Recommendation.

### C.     Vocational Expert's Testimony

The ALJ asked the VE to summarize Plaintiff's past work experience. The VE testified that Plaintiff had worked as a carpenter (medium exertional intensity), a material handler (heavy exertional intensity), a construction worker I (heavy exertional intensity), and a construction worker II (very heavy exertional intensity). (TR 72.) The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience who was not able to perform work at more than a light exertional level with the following limitations:

> . . . the person requires a sit/stand option to perform work, and the employee won't be off takes (sic) more than 10 percent of the work day with that. The person cannot climb any ladders, ropes, or scaffolds, or ramps, or stairs; cannot perform any crawling; cannot more than occasionally perform balancing, stooping, crouching, kneeling; . . . not more than occasional rotation flexion or extension of the neck; must avoid all hazards like dangerous machinery, and unprotected heights, and is limited to simple, unskilled work.

(TR 73.) The ALJ asked the VE if this individual could perform any of Plaintiff's past relevant work. The VE stated that such an individual could not perform Plaintiff's past work.

The ALJ then asked the VE if such an individual could perform any job. Before answering, the VE noted that while the Dictionary of Occupational Titles (DOT) did not address flexion of the neck, there were generally two types of flexion: (1) less pronounced flexion, like the ability to look at things in close proximity to what is right in front of the individual; and (2) more pronounced flexion, like driving, where an individual may need to rotate the neck. (TR 73-74.) When the ALJ clarified that he only intended to limit the individual from performing more pronounced flexion, the VE testified that such an individual could perform work as an X-ray inspector, an electronics worker, or a sorter of agricultural produce. (TR 74-75.)

The ALJ next asked the VE to consider a hypothetical individual with all of the restrictions included in his first hypothetical but with the following changes:

> . . . this person can operate foot controls not more than occasionally with the right lower extremity. In addition, this person must work where there is no production rate or production pace, and the person can have not more than occasional interaction with the public, not more that (sic) frequent interaction with co-workers; no tandem tasks.

(TR 75.) When asked, the VE testified that such an individual could not perform work as an electronics worker, but he could still work as an X-ray inspector or an agricultural sorter. (TR 76.) The VE added that such an individual could also work as a remnant sorter. (TR 76.)

Next, the ALJ asked the VE to assume that the same person were limited to jobs that could be performed while using a hand-held assistive device, like a cane. After receiving clarification from the ALJ, the VE testified that such an individual could perform all of the jobs that he had previously listed if the device were used for ambulation but could not perform a significant number of jobs if the device were used for ambulation and balance. (TR 76-77.) Finally, when asked, the VE testified that an individual could not sustain gainful work activity if he required a 30-minute break each day in addition to all regularly scheduled and allowed breaks. (TR 78.)

7

Plaintiff's attorney asked the VE if an individual with the restrictions in the ALJ's first hypothetical could sustain employment if he were also required to elevate his legs on two or three pillows while lying flat on his back during working hours. The VE testified that such an activity could not be accommodated. (TR 78-79.) Plaintiff's attorney then asked if the same individual would be precluded from work if, because of psychological and physical symptoms, the individual was off task 20% of the day. The VE testified that employers would find such a limitation unacceptable. (TR 79-80.)

## IV. ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ first noted that although "one could credibly argue that the new evidence or record [(since the time Plaintiff's claim was denied by the previous ALJ)] fails to show any material change in the claimant's functioning," he "[gave] the claimant the benefit of the doubt" and found that new and material evidence existed concerning Plaintiff's severe impairments. (TR 15.) The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2010, and that he had not engaged in substantial gainful activity since October 28, 2009. (TR 15.) The ALJ then found that Plaintiff suffered from severe degenerative disc disease of the lumbar spine, hepatitis C, and depression. (TR 16.) The ALJ further found that Plaintiff's impairments did not meet or equal one of the listed impairments. (TR 16.)

The ALJ then determined that Plaintiff had the following residual functional capacity:

[C]laimant has the residual functional capacity to perform light work . . . except the claimant requires a sit stand option. He cannot climb ladders, ropes, scaffolds, ramps, or stairs. The claimant can occasionally stoop, crouch, or kneel. He cannot crawl. He can only occasionally rotate, flex, or extend the neck. The claimant must avoid all hazards like dangerous machinery and unprotected heights. The claimant is limited to simple, unskilled work.

(TR 18.) Then, in reliance on the VE's testimony, the ALJ found that Plaintiff could perform a

significant number of jobs in the national economy, and therefore, he was not disabled from October 28, 2009, through the date of the ALJ's decision. (TR 23-25.)

## V. LAW AND ANALYSIS

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

**B.     Framework for Social Security Determinations**

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     Plaintiff was not presently engaged in substantial gainful employment; and

(2)     Plaintiff suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

**C.     Analysis**

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material

evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174). Plaintiff argues that this matter should be remanded under sentence four because (1) the ALJ did not rely on a medical source when determining equivalency at Step 3 of his analysis; (2) the ALJ's RFC with regard to Plaintiff's sit–stand option is flawed; (3) the ALJ improperly discounted Plaintiff's testimony with regard to his hepatitis C; (4) the ALJ's RFC with regard to Plaintiff's mental restrictions is flawed; (5) the ALJ erred in his credibility analysis of Plaintiff; and (6) the ALJ erroneously gave Ms. Biestek, Plaintiff's mother, little weight. (Docket no. 16.)

### 1. The ALJ's Step-3 Equivalency Analysis

Plaintiff asserts that the ALJ's Step-3 analysis requires remand as a matter of law because the ALJ found that Plaintiff's impairments did not equal those in Listing 1.04 without reliance on any medical opinion. (*Id.* at 14.) Plaintiff asserts that "longstanding policy requires" that the ALJ rely on "the judgment of a physician designated by the Commissioner on the issue of equivalence." (*Id.* (citing *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004).) Plaintiff contends that while such a requirement is satisfied by a physician signature on the Disability Determination Transmittal Form, Plaintiff's DDT form was signed by non-physician, Single Decision Maker Sonia Dewberry. (*Id.* at 15 (citing TR 102-03).) Defendant notes that Plaintiff cites no controlling cases from the

11

Sixth Circuit "to support the notion that a lack of an opinion on equivalence is *per se* reversible error," and argues that it is "Plaintiff's 'burden to prove that he has an impairment or combination of impairments . . . medically equal to one listed.'" (Docket no. 18 at 10 (citing 20 C.F.R. Pt. 404, Subpt P, App. 1).) Defendant asserts that "Plaintiff fails to provide any significant explanation as to how his condition could equal Listing 1.04A" and that he "does not point to evidence showing that his spine condition resulted in motor loss, sensory loss, or any positive straight-leg raising tests," as required by the Listing. (*Id.* at 10-11.) Thus, Defendant argues, Plaintiff's argument fails. The undersigned disagrees.

While Defendant is correct that Plaintiff's contention regarding the medical-opinion requirement at Step 3 is not based on controlling precedent, Defendant's position is likewise without controlling support. The Sixth Circuit has not specifically addressed this issue, but this Court has found that "[t]he great weight of authority holds that a record lacking any medical advisor opinion on equivalency requires a remand." *McPhee v. Commissioner of Social Sec.*, No. 12-13931, 2013 WL 3224420, \*16 (E.D. Mich. June 25, 2013) (Steeh, J.) (adopting Report and Recommendation from Hluchaniuk, M.J.) (citations omitted). Thus, notwithstanding Defendant's contention that Plaintiff cannot show that his condition could equal the listing requirements, "'[n]either the ALJ nor this court possesses the requisite medical expertise to determine if [plaintiff]'s impairments . . . equal one of the Commissioner's listings.'" *Id.* at \*17 (quoting *Freeman v. Astrue*, 2012 WL 384838, at \*4 (E.D. Wash. Feb. 6, 2012)). Therefore, the undersigned recommends remanding this matter for a proper determination at Step 3.

### 2. The ALJ's Sit–Stand Analysis

As a secondary argument, Plaintiff asserts that the ALJ erred when he failed to define "the maximum duration and frequency of the shifting in positions from sitting to standing" because

Plaintiff's RFC does not "specify the 'most' that [Plaintiff] can do despite his impairments." (Docket no. 16 at 18.) Plaintiff contends that the ALJ's hypothetical does not "set forth the frequency of the claimant's need to alternate sitting and standing." (*Id.*) In support of remand, Plaintiff relies on the court's discussion in *Ferguson v. Comm's or Soc. Sec.:*

> The question to the VE included a "sit/stand option" but it did not include the frequency required for position changes, i.e. 30 minutes, 15 minutes, at will, etc. However, although the hypothetical question contained only a generic sit/stand option, the RFC found in the administrative opinion stated that Plaintiff was limited to "a sit/stand option at the workstation while remaining at the workstation (option means that the individual can sit/stand at will while performing their assigned duties)." While it is possible that the VE interpreted the hypothetical question to state that the individual required the ability to change position at any time, the hypothetical question did not include the "at will" limitation found in the RFC.
>
> Further, the VE's testimony contains no indication that she inferred an "at will" sit/stand restriction in the hypothetical question. I disagree with Defendant's contention that an "at will" restriction was implied by Plaintiff's earlier testimony that he needed to change positions every 10 to 15 minutes. This Court has no way of knowing if the VE's job numbers reflect the inclusion of the "at will" restriction later stated in the RFC. While Defendant also argues that Plaintiff ought to have raised the sit/stand issue at the hearing, Plaintiff could not have foreseen that the ALJ would impose a more restrictive limitation in the RFC than in the hypothetical question. If the ALJ believed that Plaintiff required a sit/stand at will restriction, his failure to include it in the hypothetical question invalidates the VE's job findings. *See Teverbaugh v. Comm'r of Soc. Sec.*, 258 F.Supp.2d 702, 706 (E.D.Mich.2003) (Roberts, J.) (job findings made in response to an incomplete set of limitations, do not constitute substantial evidence). Because Defendant has not met its burden at Step Five of the sequential analysis, the case must be remanded.

No. 11–15072, 2013 WL 530868, *5-6 (E.D. Mich. Jan 23, 2013) (Whalen, M.J.) (citations to the record omitted).

Like the defendant in *Ferguson*, Defendant argues that Plaintiff's contention fails because "the statement that Plaintiff required a sit/stand option . . . should be read to indicate that Plaintiff should not be limited in his choice to shift between sitting and standing" and that in the ALJ's discussion of Plaintiff's RFC he provided "that Plaintiff should have 'the ability to sit and stand as

13

needed.'" (Docket no. 18 at 20 (quoting TR 22).) But the ALJ relied on the VE's testimony in determining whether Plaintiff was disabled, and there is no indication that the VE interpreted the ALJ's hypothetical to include an "at will" sit–stand option. To the contrary, like in *Ferguson*, Plaintiff testified that he could sit or stand for 10 to 15 minutes before he would have to shift positions. (TR 68.) Without more, the Court should not assume that the VE's testimony was based on the ALJ's unstated, more-limiting "at-will" restriction. Thus, this matter should be remanded for further determination.

### 3.     The ALJ's Consideration of Plaintiff's Hepatitis C

Plaintiff argues that the ALJ's analysis of the limiting effects of his hepatitis C is flawed because he "incorrectly interprets [a biopsy report]" and "plays amateur doctor." (Docket no. 16 at 19.) Moreover, Plaintiff contends, the ALJ failed to consider certain records, including those showing increased fatigue and side effects from Plaintiff's treatment. (*Id.*) As Defendant argues, however, Plaintiff misinterprets the ALJ's findings. The ALJ considered the medical evidence of record and determined that the evidence did "little to indicate exactly how this impairment has worsened since October 28, 2009." (TR 20.) The ALJ based this conclusion on the biopsy report and a finding that Plaintiff's testimony was "vague as to why the treatment had deleterious effects on his weight and on his overall health." (*Id.*) Moreover, as Defendant contends, Plaintiff has provided no indication regarding what limiting effects the ALJ would have included in his RFC if the ALJ had "properly" considered his hepatitis C. Thus, Plaintiff's Motion should be denied with regard to this issue.

### 4.     Plaintiff's Mental Restrictions

In adopting Plaintiff's mental RFC, the ALJ considered the opinions of consultative examiner Dr. H. Gummadi, M.D., and state agency psychologist, Dr. Edward Czarnecki. (TR 21.)

The ALJ gave "significant weight" to each of these opinions but noted that he "especially rel[ied] on Dr. Gummadi's opinion because he personally evaluated the claimant and because he is a disinterested third party with no appreciable bias towards either the claimant or the Administration." (TR 21-22.) Plaintiff argues that the ALJ then erred when he adopted only a portion of the restrictions included in Dr. Gummadi's opinion with regard to social functioning. (Docket no. 16 at 20-21.) Specifically, Plaintiff contends that the ALJ failed to properly include a limitation of "only superficial interactions with coworkers, supervisors and the public." (*Id.*)

Notably, however, the ALJ did not afford Dr. Gummadi complete deference; he afforded Dr. Gummadi's opinion significant weight. As Defendant states, "the ALJ provided an extensive discussion regarding why Plaintiff did not have social limitations." (Docket no. 18 at 24.) Specifically, the ALJ noted that Plaintiff goes to his son's sporting events without social anxiety; he "maintained an appropriate demeanor throughout the hearing;" he did not exhibit any "anxiety or abnormal behavior towards various medical professionals;" he "testified to improved relationships with his wife and son;" and that "the record fails to document any extreme deficiencies in the claimant's memory, concentration, social functioning, and general cognitive state." (TR 21.) The undersigned agrees with Defendant and finds that the ALJ's decision in this regard is supported by substantial evidence. Therefore, Plaintiff's Motion with regard to this issue should be denied.[3]

### 5. Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight

---

[3] Plaintiff further alleges that the ALJ's analysis with regard to concentration, persistence, and pace is flawed, but Plaintiff merely notes that the State Agency Reviewer found such restrictions and sets forth the Sixth Circuit requirement for including such limitations in hypothetical questions to the VE. Plaintiff's argument is undeveloped. Moreover, it does not appear that the ALJ credited such findings. Therefore, the ALJ was not required to include such limitations in his hypothetical questions.

and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997). But credibility assessments are not insulated from judicial review. Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

Plaintiff asserts that the ALJ's analysis of his credibility is flawed and points to several

16

pieces of evidence supporting his allegations of pain and functional limitations. (*See, generally*, docket no. 16 at 21-24.) In particular, Plaintiff claims that the ALJ improperly found that he was not disabled based on (1) an analysis of his daily activities, (2) Plaintiff's (response) to his epidural injection therapy, and (3) Plaintiff's use of methadone. (*Id.*)

With regard to his daily activities, contrary to Plaintiff's assertion, the ALJ did not find that Plaintiff was not disabled because he engaged in sporadic daily activities. In discussing Plaintiff's credibility, the ALJ found that "[t]he record documents perplexing inconsistencies." (TR 19.) The ALJ noted, for example, that Plaintiff's claims that his mother had to tie his shoelaces were inconsistent with his statement that he could drive a car; and while Plaintiff alleged disabling back pain, at "various points since the alleged onset date . . . [,] he was exercising and playing football with his son." (*Id.*) While the undersigned acknowledges that comparing Plaintiff's ability to tie his shoes with his ability to drive a car is somewhat perplexing in itself, the ALJ's consideration of these activities is not error. To the contrary, the ALJ is required to consider claimant's daily activities as part of his analysis.

With regard to Plaintiff's injections, the ALJ found that "claimant's testimony that the epidural injections only made his lower back pain worse are also statements at odds with his prior reports." (TR 19.) The ALJ noted that claimant had stated that his back pain "responded well" to the injections with reported pain of a "1/10." (TR 20.) Plaintiff asserts that the ALJ misinterpreted these records because they are immediately (or within a day) following the injections and that Plaintiff's pain persisted after the injections. (Docket no. 16 at 23.) But Plaintiff, again, misinterprets the ALJ's use of these reports. The ALJ did not rely on Plaintiff's statements regarding his pain immediately following his injections to find that Plaintiff's back pain is nonexistent. Instead, the ALJ considered these statements in correlation to Plaintiff's testimony that

17

the injections made his back pain worse, finding these statements at odds. (*See* TR 19-20.) The ALJ did not err in this regard.

Finally, Plaintiff's contention that the ALJ erroneously assumed he was "engaging in drug seeking behavior" because he was on methadone is unpersuasive. As Defendant argues, the ALJ made no such finding. In considering the type, dosage, and effect of Plaintiff's medication, the ALJ found that the "present amounts of medication are not wholly attributable to pain levels." (TR 20.) To reach this conclusion, the ALJ noted that Plaintiff "admitted to a counseling provider that he had lied to [doctors] to obtain more narcotic pain medications" and that there were "repeated mentions that the claimant needed to be weaned off of narcotics." (TR 29.) Thus, the ALJ commented, "I take little persuasive effect from the fact that the claimant is presently taking methadone." (TR 20.) Such a finding is not error. Therefore, the Court should deny Plaintiff's Motion with regard to this issue.

### 6. Ms. Biestek's Statements

Plaintiff additionally argues that the ALJ erred when he gave "little weight" to Plaintiff's mother's opinions because she could "provide insight into the severity of the impairment" and because an ALJ "may not find a witness's testimony not creibly simply for example because the witness is friendly with the claimant." (Docket no. 16 at 24 (citing *Allord v. Barbhart*, 455 F.3d 818, 821 (7th Cir. 2006).) Again, however, the ALJ made no such finding. The ALJ did discount Ms. Biestek's statements, in part, because she was not a disinterested person, but he also noted that she was "not medically trained" and that her statements were "not consistent with the preponderance of the opinions and observations by medical doctors." (TR 22.) Moreover, as Defendant contends, the "objective evidence" on which Plaintiff relies to support his contention that Ms. Biestek's statements are "consistent" with the record are Plaintiff's own subjective complaints. Plaintiff's

18

argument fails, and the Court should deny his Motion with regard to this issue.

## VI.    CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 16) should be GRANTED IN PART AND DENIED IN PART, and Defendant's Motion for Summary Judgment (docket no. 18) should be DENIED.  The Court should reverse and remand this matter under sentence four of 42 U.S.C. § 405(g) for a proper Step-2 determination in accordance with this Report and Recommendation and, if necessary following such a determination, for additional determination with regard to the Vocational Expert's testimony as discussed herein. Plaintiff's Motion with regard to all other issues should be denied.

### REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: May 30, 2014          s/ Mona K. Majzoub
                             MONA K. MAJZOUB
                             UNITED STATES MAGISTRATE JUDGE

### PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: May 30, 2014          s/ Lisa C. Bartlett
                             Case Manager